"Sworn to before me this 15th day of February, 1890,

"JOHN MULHOLLAND, Notary Public, (75,) N. Y. Co."

And, further, that the relator's record as an officer returned by the respondent, and which was doubtless used against him, was not given in evidence at the trial, or he given any opportunity to explain it. These things combined suggest elements employed in the consideration of the case which should not have been countenanced, and therefore not permitted to influence the respondents in forming their judgment. Ordered as suggested, with costs. All concur.

---

BARROW S. S. CO. *v.* MEXICAN CENT. R. CO.

*(Supreme Court, General Term, First Department. July 18, 1890.)*

CONTRACT—INTERPRETATION.

An agreement between plaintiff and defendant for the transportation of Mexican pilgrims from New York to Rome by a steamer owned by plaintiff was made by a correspondence, which commenced with a letter from defendant referring to a preceding conversation respecting the matter, and adding: "Our people in Mexico advise that upon favorable terms they can secure a party of about 175 or 200 people, with a possibility of increasing the number. These people will be divided into classes, about as follows: 75 first-class, 75 second-class, 50 steerage." Plaintiff replied stating the rates, but without mentioning any number, and received an answer expressing dissatisfaction with the rates, and stating: "There is a probabil-

ity that there will be 250 people, or more." Plaintiff then wrote stating, *inter alia:* "We beg to confirm the understanding arrived at between us, viz., that you will not ship less than 75 first-class, 75 second-class, and 100 third-class passengers for the round trip;" and then again mentioned the rates, which were accepted by a letter on the same day, stating: "There is a probability that the party will exceed 250." Other letters passed without mentioning the number of passengers until plaintiffs wrote expressing surprise at hearing of a falling off in the number of the passengers, and notifying defendant it would be held responsible for the passage money on the numbers originally arranged. The vessel was then engaged for the trip. *Held,* that the agreement was for the transportation of 250 persons, including the different classes, and that plaintiff could recover of defendant damages resulting from its failure to furnish that number. Distinguishing *Railway Co. v. Dane,* 43 N. Y. 240. DANIELS, J., dissenting.

Appeal from circuit court, New York county.

Action by the Barrow Steam-Ship Company against the Mexican Central Railroad Company. Verdict and judgment for plaintiff. Defendant appeals.

Argued before VAN BRUNT, P. J., and BRADY and DANIELS, JJ.

*Wing, Shoudy & Putnam,* (*J. A. Shoudy,* of counsel,) for appellant. *S. F. Kneeland,* for respondent.

BRADY, J. The plaintiff, as the owner of the steam-ship Bolivia, made a contract with the defendant for the transportation by that steamer of Mexican pilgrims from New York to Rome. The complaint alleges that the defendant agreed to ship not less than 250 passengers; 75 of the first-class, 75 second-class, and 100 third-class. It also alleges that the defendant only furnished 64 first-class, 29 second-class, and 44 third-class passengers, and the plaintiff was compelled to send the vessel with the number of passengers designated, and suffered damage in consequence to an amount stated. The answer admits that passengers to the number alleged were furnished only, but denies that the contract bound the defendant to furnish any greater number. It was conceded on the trial that, if the plaintiff was entitled to any damages, the amount of them would be $5,471, for which amount a verdict was directed by the court, although it would seem from the opinion delivered upon the motion for new trial, that the learned justice presiding entertained, as he said, considerable doubt as to whether the plaintiff had any cause of action against the defendant. Whether or not a contract was made between them, depends upon the construction to be placed upon the correspondence relating to the engagement of the vessel named, and to this correspondence our attention will be now directed. In a letter written on behalf of defendants dated March 24, 1888, it was said by the writer, among other things: "Referring to the subject of our conversation regarding the pilgrimage from Mexico to Rome, I beg to say that our people in Mexico advise that upon favorable terms they can secure a party of about 175 or 200 people, with a possibility of increasing the number. These people will be divided into classes, about as follows: 75 first-class, 75 second-class, 50 steerage." On March 31st, in a letter written on behalf of the defendant, the writer says: "Again referring to the subject of the pilgrimage from Mexico to Rome, I have to say that I am in receipt of a telegram from Mexico, advising that all arrangements have been made, so that this party can leave there at an early date, and there is a probability that there will be 250 people, or more." The answer of the plaintiff to that letter says, among other things: "We beg to confirm the understanding arrived at between us, viz., that you will not ship less than 75 first-class, 75 second-class, and 100 third-class passengers for the round trip." By letter of the same date, evidently in answer to the letter just referred to, the writer says: "Regarding the numbers of the party, I beg to say that my latest advice from Mexico, as mentioned in my previous letter of this date, that there is a probability that the party will exceed 250, but I have not been furnished with information as to the exact number of each class." The next letter found in the order of correspondence is dated April 3, 1888, written on behalf of the plaintiffs, in which no reference is made to the number of passengers. Upon the

same day a letter was written on behalf of the defendant, in which it is said: "I beg to advise you that I am in receipt of further telegraphic communications regarding the pilgrimage party from Mexico to Rome, and am advised that the final details are now being prepared, and that the party will leave Mexico, as intended, on the 7th inst. There is no suggestion in that letter as to the number of passengers, and therefore, according to the correspondence up to that time, the understanding was that there would not be less than 250 passengers. This was but a few days before the steamer was to sail. On the 12th of April, however, the following letter was written on behalf of plaintiffs, and, according to the recollection of the witness, in answer to a verbal communication:                                                    "APRIL 12th, 1888.

"*George W. Keeler, Esq., Gen. Eastern Agent Mexican Central Ry.*, 261 *Broadway, City*—DEAR SIR: We were very much surprised to learn from your representative this morning of the great fall-off in the numbers of the Mexican excursion party, from what were guarantied in your letter of the 31st ult. to us, and for which we have been making preparations, namely: 75 first-class, 75 second-class, and 100 third-class passengers. Every other consideration having been sacrificed by us to accommodate this party, we beg to notify you that we shall hold you responsible for the passage money due to us on the numbers originally arranged for.

"Yours, truly,                                     HENDERSON BROTHERS."

To this letter the following response was sent on behalf of the defendants:
                                                    "NEW YORK, April 13, 1888.

"*Messrs. Henderson Bros., Agents Anchor Line*, 7 *Bowling Green, N. Y. City*—GENTLEMEN: Upon my return I find your favor of the 12th inst. regarding pilgrimage from Mexico to Rome. I beg to correct the impression which you seem to have that my letters of the 31st ult. guarantied you 75 first-class, 75 second-class, and 100 third-class passengers. Those letters contained information as to size of the party exactly as I received it from Mexico, namely, ' that there is a probability that the party will exceed 250,' and in fact one of the letters distinctly states that no information had been received as to the number of people in each class. Your Mr. Martin has seen all recent telegraphic correspondence between our people at Mexico and this office upon the subject of this pilgrimage, and while I have expected that the numbers would be in accordance with indications contained in such telegrams, I have made no definite guaranty, either verbally or in writing; and, moreover, had you been guarantied 250 people it would have been unnecessary for you to have made daily inquiries during the present week as to the number in the party, as you have done. As shown in the telegram, of which a copy was left at your office yesterday, this pilgrimage has proved a partial failure, and can result in no profit to the Mexican Central Railway, or any of the other railways in interest.

"Under the circumstances it is but fair that you should accept the situation the same as the other lines, as our chances of securing future parties against competition by direct steamers from Vera Cruz to Europe, will depend upon our making a success, as far as the people are concerned, of the present pilgrimage, just as much as though the number had been as large as our people had reason to expect.

"Very respectfully,                                 G. W. KEELER."

It will be observed that the last paragraph of this response suggests an acceptance of the situation as but fair, and for the reasons assigned. But it does not appear by anything said or done by the plaintiffs that they waived any of the rights secured by the contract, which they regarded as having been consummated, or accepted the suggestion that they should waive any such rights. It will have been observed from the phraseology employed in the correspondence that the number of excursionists originally contemplated was increased, and that there was no suggestion of a diminution of the number

finally named, until the letter of the 12th of April. On the 24th of March the number was stated at or above 175 or 200, with a probability of increasing the number. In the letter of the 31st of March it was said: "There is a probability that there will be 250, or more, and when upon that day the plaintiffs wrote to the defendant's agent confirming the understanding as to 250 passengers of different classes there was no suggestion in the answer to that letter of a less number. The number in the aggregate up to 250 was positively stated. The conjecture was as to the number of each class, about which exact information had not been furnished. The rest of the correspondence up to the 12th of April was based upon the proposition that there would be 250 passengers in different classes, with a probability not that it would be less than that number, but that it would exceed it, and this understanding presented itself in such force as to clearly justify the plaintiffs in making the necessary arrangements to transport the number named, which they proceeded to do. As the result, therefore, of the proper consideration and construction of the correspondence, the engagement was for the transportation of 250 persons including the different classes. It is undoubtedly the rule that the intention of the parties is to govern in the interpretation of contracts, especially when they are ambiguous, or uncertain, by expression. But the object in view necessarily enters into the consideration of what the parties intended. It certainly was intended that the plaintiffs should make the necessary preparation for the transportation of 250 persons divided into different classes, and they were bound to be in readiness at the time designated to carry out such a contract, and were entitled to the time necessary to make such preparation. The contract between the parties depending upon the interpretation and construction of the correspondence is *sui generis,* and adjudications in kindred cases are of comparatively little value. We are referred by the learned counsel for the appellants to a number of decisions which he thinks are conclusive; for example, that of *Railway Co.* v. *Dane,* 43 N. Y. 240. But the agreement there was to transport not exceeding 6,000 lbs. of freight during a certain period. Of course that is an entirely different case. The case of *Robinson* v. *Noble's Adm'rs,* 8 Pet. 181, is regarded by the learned counsel as similar to this. But there the agreement was to ship certain stores supposed to amount to 3,700 barrels, assuming one-half as flour barrels, and the other as whisky or pork barrels. But this was conjectural. Whether there would be 3,700 barrels or not is in doubt. It should not be overlooked that in the letter of April 12th the defendants were notified of the attitude taken by the plaintiffs with regard to the contract, and that they would be held responsible for the passage money on the numbers originally arranged; notwithstanding which the ship was employed for the transportation, and the numbers furnished carried to their destination. It may also be said that under any other interpretation of the contract the plaintiffs would be bound to proceed on the voyage with any number of passengers that the defendants chose to furnish, a result seemingly, at least, iniquitous. It is thought that under all the circumstances the plaintiffs were entitled to recover, and that the judgment should be affirmed, with costs.

VAN BRUNT, P. J., concurs.

DANIELS, J., (*dissenting.*) The verdict was directed for the damages sustained by the plaintiff from the failure of the defendant to furnish at least 250 passengers to be carried by the plaintiff by steamer and railway from the city of New York to the city of Rome, and back to the city of New York. The passengers were Mexican pilgrims, visiting Rome by way of Naples, and the contract between the parties for their carriage was made by correspondence. And the right of the plaintiff to maintain the action to the extent to which it has been permitted depends upon the existence of an obligation on

the part of the defendant to furnish 250 passengers. It did furnish no more than 134, and the damages awarded were for the loss arising out of the difference between that number and 250. Whether the defendant became liable for these damages must be acertained from the letters themselves which passed between the agents. These letters, as they are contained in the case, commenced with one written on the 24th of March, 1888, by the agent of the defendant to those representing the plaintiff. It refers to a preceding conversation relating to the business, and then .adds: "Our people in Mexico advise that upon favorable terms they can secure a party of about 175 or 200 people, with a possibility of increasing the number. These people will be divided into classes as follows: 75 first-class, 75 second-class, 50 steerage." The plaintiff's agents replied on the 27th of March stating the prices for the different classes of passengers, but without mentioning any number. The agent of the defendant wrote again expressing dissatisfaction concerning the rates, and still further: "I have to say that I am in receipt of a telegram from Mexico advising that all arrangements have been made so that this party can leave there at an early date next month, and there is a probability that there will be 250 people, or more." The plaintiff's agents under the same date, which was March 31, 1888, wrote again to the same person, making as a part of their letter this statement: "We beg to confirm the understanding arrived at between us, viz., that you will ship not less than 75 first-class, 75 second-class, and 100 third-class passengers for the round trip;" and then again mentioned the terms for the passengers. The rates were accepted by a letter in reply on the same day, and adding further: "Regarding the numbers of the party, I beg to say that my latest advice from Mexico, as mentioned in my previous letter of this date, is that there is a probability that the party will exceed 250, but I have not been furnished with information as to the exact number of each class. I have telegraphed the first and second class capacity of the Bolivia, and of course if our people exceed those numbers in either class, such excess numbers will have to adapt themselves to the accommodations which can be furnished." Nothing further was stated as to the number until the 12th of April, and then the agents of the plaintiff wrote: "DEAR SIR: We were very much surprised to learn from your representative this morning of the great fall-off in the numbers of the Mexican excursion party from what were guarantied in your letter of the 31st ult. to us, and for which we have been making preparations, namely, 75 first-class, 75 second-class, and 100 third-class passengers. Every other consideration having been sacrificed by us to accommodate this party, we beg to notify you that we shall hold you responsible for the passage money due to us on the numbers originally arranged for." And on the next day the defendant's agent to whom this letter was addressed replied, concerning the terms of the agreement, as follows: "I beg to correct the impression which you seem to have that my letters of the 31st .ult. guarantied you 75 first-class, 75 second-class, and 100 third-class passengers. Those letters contained information as to size of the party exactly as I received it from Mexico, namely, 'that there is a probability that the party will exceed 250;' and in fact one of the letters distinctly states that no information had been received as to the number of people in each class. Your Mr. Martin has seen all recent telegraphic correspondence between our people at Mexico and this office upon the subject of this pilgrimage, and while I have expected that the numbers would be in accordance with indications contained in such telegrams I have made no definite guaranty, either verbally or in writing, and, moreover, had you been guarantied 250 people it would have been unnecessary for you to have made daily inquiries during the present week as to the number in the party, as you have done."

It seems quite clear from this correspondence that the defendant did not become bound to furnish as many as. 250 passengers. The first suggestion as

to the number was that the people in Mexico advised that they could upon favorable terms secure a party of 175 or 200, with a possibility of increasing the number. That was followed by a later letter saying that all arrangements had been made for the party to leave Mexico, and that there was a probability that there would be 250 persons or more. And the plaintiff's agents in reply stated that they begged to confirm the understanding arrived at that not less than 75 first-class, 75 second-class, and 100 third-class passengers would be shipped. There had, however, been no definite understanding or agreement to that effect made. But all that had been done was to make the statement of what were considered probabilities as to numbers. And that, as it was finally expressed, was "that there is a probability that the party will exceed 250." But there was no agreement in this, or any preceding letter, that it would reach that number. At most, estimates were given which the facts failed to realize. And when the statement was made of the understanding of the plaintiff's agents, that was not accepted as a correct result of what previously had been written, but the writers were informed that there was a probability that the party would exceed 250, as that was mentioned in the preceding letter of the agent of the defendant. This was not an acceptance of the understanding mentioned by the plaintiff's agents, but, at most, it was a reference to what was written in the preceding letter as to the number of the party expected; and in that letter the number was mentioned as probably 250, or more. It did not obligate the defendant to furnish a party of 250 persons, but stated the advices, and probabilities only, which placed the plaintiff's agents in a position where they could judge for themselves as to the number of people probably to be carried. What was written failed to create any positive obligation that this number of people would form the party. The agents on each side were supplied with the same information as to what might be expected. And the hopes created by it exceeded the reality. For the result of the disappointment the defendant did not become liable, certainly not to the extent determined at the trial. The judgment and order should be reversed, and a new trial ordered, with costs to the defendant to abide the event.